# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

UNITED STATES OF AMERICA,
ex rel. CORTNEY TAYLOR,

          Plaintiff,

v.                                      CIVIL ACTION NO. 2:17-cv-04213

MICHAEL J. BOYKO, M.D., et al.,

          Defendants.

## MEMORANDUM OPINION AND ORDER

The Court has reviewed the Relator's *Amended Complaint for Violations of the False Claims Act, 31 U.S.C. § 3729, et seq.* (Document 101), *Defendant Martin Gottlieb & Associates, LLC's Motion to Dismiss Amended Complaint* (Document 108), *Defendant Martin Gottlieb & Associates, LLC's Memorandum in Support of Its Motion to Dismiss Amended Complaint* (Document 109), the *Relators' Memorandum in Opposition to Defendant Martin Gottlieb & Associates, LLC's Motion to Dismiss Amended Complaint* (Document 112), and the *Response to Plaintiff's Memorandum in Opposition to Defendant, Martin Gottlieb & Associates, LLC's Motion to Dismiss Amended Complaint* (Document 115), as well as all attachments. In addition, the Court has reviewed *Defendant Martin Gottlieb & Associates, LLC's Motion for Leave to File Response to Plaintiff's Memorandum in Opposition to Defendant, Martin Gottlieb & Associates, LLC's Motion to Dismiss Amended Complaint* (Document 116), wherein counsel for Gottlieb requests

leave to file its reply brief several hours late, without objection. The motion for leave to file will be granted, and the Court will consider the reply brief.

The Court has also reviewed *Defendants Michael J. Boyko, M.D., Mark Perni, D.O., BestPractices of West Virginia, Inc., BestPractices, Inc., Holiday Acquisition Company, Inc., EmCare, Inc., and Envision Healthcare Corporation's Motion to Dismiss Amended Complaint* (Document 110), *Defendants Michael J. Boyko, M.D., Mark Perni, D.O., BestPractices of West Virginia, Inc., BestPractices, Inc., Holiday Acquisition Company, Inc., EmCare, Inc., and Envision Healthcare Corporation's Memorandum in Support of Their Motion to Dismiss Amended Complaint* (Document 111), the *Relators' Memorandum in Opposition to Defendants Boyko, Perni, BestPractices of West Virginia, BestPractices Inc., Holiday Acquisitions Company, Inc., EmCare, Inc., and Envision Healthcare Corporation's Motion to Dismiss* (Document 113), and *Defendants Michael J. Boyko, M.D., Mark Perni, D.O., BestPractices of West Virginia, Inc., BestPractices, Inc., Holiday Acquisition Company, Inc., EmCare, Inc., and Envision Healthcare Corporation's Reply Memorandum in Support of Their Motion to Dismiss the Amended Complaint* (Document 114), as well as all attachments. For the reasons stated herein, the Court finds that the Gottlieb's motion to dismiss should be granted and that the remaining Defendants' motion to dismiss should be granted in part and denied in part.

**FACTUAL ALLEGATIONS**

The Relator, Cortney Taylor, initiated this action pursuant to the False Claims Act (FCA) on behalf of herself and the United States with a *Complaint for Violations of the False Claims Act, 31 U.S.C. § 3729, et seq.* (Document 1) filed on October 25, 2017. The complaint remained sealed until September 6, 2018. Ms. Taylor named the following Defendants: Michael J. Boyko, M.D.,

Mark Perni, D.O., BestPractices of West Virginia, Inc. (BPWV), Martin Gottlieb & Associates LLC (Gottlieb), BestPractices, Inc. (BP), Holiday Acquisition Company, Inc., EmCare, Inc., and Envision Healthcare Corporation. The Court granted motions to dismiss with the exception of a single claim against Dr. Perni on June 7, 2019. Ms. Taylor filed the amended complaint on September 17, 2019. She seeks to recover damages and penalties on behalf of the United States arising from alleged false claims made or caused to be made by the Defendants and/or false records material to false claims made or caused to be made by the Defendants.

BPWV contracted to manage the Camden-Clark Medical Center (CCMC) emergency department. Dr. Boyko was employed by BPWV and served as a physician at CCMC. Dr. Perni was a *locum tenens* physician who was providing medical services at CCMC on August 2, 2012, although he had not signed the contract governing BPWV's relationship with CCMC. Because Dr. Boyko was not scheduled to work on August 2–3, 2012, the Relator alleges that it was not permissible for Dr. Perni to take his place for billing purposes. Jennifer Angelilli was a nurse practitioner employed by BPWV and working at CCMC. She also had not signed the contract. Her credentials to practice as a nurse practitioner required that she be supervised by a physician. She did not have a supervising physician at CCMC.

BPWV's state corporate license to conduct business and medical license were revoked on November 1, 2011, due to failure to file an annual report and filing fee. Notice of the license revocation was mailed to Dr. Thomas Mayer, the sole owner and President of BPWV. Dr. Mayer was also CEO of BP and Executive Vice President of EmCare. BPWV continued to operate the emergency department of Camden-Clark Medical Center following the license revocations until March 2013, including submitting claims for reimbursement to Medicare for at least 25,000

3

patients. BPWV did not notify CMS (Centers for Medicare & Medicaid Services) of the license revocations. The Relator alleges that CMS treats revocation of a business license as material to payment decisions based on administrative decisions revoking providers' billing privileges. Regulations permit CMS to revoke providers' billing privileges as a result of noncompliance with enrollment requirements, which include maintaining applicable state and federal licenses.

Ms. Taylor received treatment for post-caesarean section abdominal pain at the CCMC emergency department on August 2–3, 2012. She is a Medicare beneficiary, and claims for her care were submitted to Medicare for payment. Her medical records list Dr. Perni as her attending physician and Ms. Angelilli as providing additional care. Ms. Angelilli diagnosed Ms. Taylor with cellulitis, then documented that her condition had improved and that she was stable prior to discharging her with a prescription for antibiotics around 4:00 a.m., on August 3, 2012. Dr. Perni did not make entries on the medical record until approximately two hours after Ms. Taylor had been discharged. He did not provide her with medical care but signed her record for billing purposes, completing an "Attending Note" box to "[permit] a provider to bill at a higher level of care because a physician was involved." (Am. Compl. at ¶ 234.)

Ms. Taylor sought additional treatment on August 3, 2012. She was diagnosed with necrotizing fasciitis, a potentially fatal condition, and transferred to West Virginia University for surgical intervention and treatment on August 4, 2012.[1] Gottlieb prepared an invoice for Ms. Taylor, billing $668 with a code applicable to severe, life threatening, presenting problems. The invoice included a code modifier to reflect the provision of services by a *locum tenens* physician in place of the regular physician, since Dr. Perni was replacing Dr. Boyko during Ms. Taylor's

---

[1] Ms. Taylor brought a medical malpractice action in state court as a result of the misdiagnosis.

visit. However, Dr. Boyko had never been scheduled to work on that date. Gottlieb submitted the invoice for payment, using billing codes applicable to care provided by a physician, though it had the medical records showing that Dr. Perni signed the records two hours after Ms. Taylor was released from the hospital. Medicare reimbursed BPWV at the full physician rate, rather than the 85% rate applicable to care provided by a nurse practitioner.

## STANDARD OF REVIEW

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of a complaint or pleading. *Francis v. Giacomelli,* 588 F.3d 186, 192 (4th Cir. 2009); *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir. 2008). Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Additionally, allegations "must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Moreover, "a complaint [will not] suffice if it tenders naked assertions devoid of further factual enhancements." *Iqbal,* 556 U.S. at 678 (*quoting Twombly,* 550 U.S. at 557) (internal quotation marks omitted).

Rule 9(b) of the Federal Rules of Civil Procedure requires that a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake," although

allegations related to state of mind "may be alleged generally." "To satisfy Rule 9(b), a plaintiff asserting a claim under the [False Claims] Act 'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 455–56 (4th Cir. 2013) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,* 525 F.3d 370, 379 (4th Cir.2008)). The Fourth Circuit cautions courts to "adhere[] firmly to the strictures of Rule 9(b) in applying its terms to cases brought under the Act," explaining that "[t]he multiple purposes of Rule 9(b), namely, of providing notice to a defendant of its alleged misconduct, of preventing frivolous suits, of eliminating fraud actions in which all of the facts are learned after discovery, and of protecting defendants from harm to their goodwill and reputation are as applicable in cases brought under the Act as they are in other fraud cases." *Id*. at 456 (internal quotation marks and citations omitted).

When reviewing a motion to dismiss, the Court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). The Court must also "draw[ ] all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). However, statements of bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim. *Iqbal,* 556 U.S. at 679. Furthermore, the court need not "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice . . . [because courts] 'are not bound to accept as true a

legal conclusion couched as a factual allegation.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555).

## DISCUSSION

The Defendants[2] argue that Ms. Taylor's amendments are insufficient to permit the claims this Court previously dismissed to go forward. They assert that the revocation of BPWV's state medical and business licenses as a result of its failure to pay a nominal fee and file renewal paperwork is not material to the payment of Medicare claims. The Defendants argue that the administrative decisions relied upon by the Relator in the amended complaint do not "show that Medicare conditions *payment* of claims on the validity of a business or corporate medical license, that state license revocations are *central* to patients' care, that the government has ever denied payment of a Medicare claim because of an administrative revocation, or that the United States has ever brought enforcement actions based on such non-compliance." (Document 112 at 2, emphasis in original.) They further contend that the Relator has failed to adequately plead scienter. As to the upcoding claims, the Defendants argue that the amended complaint "still fails to plead *any details* regarding any claims other than the one for Taylor's bill or any Defendants' knowledge as to the alleged upcoding of Taylor's bill (other than Dr. Perni)." (*Id*. at 3, emphasis in original.) Both Gottlieb and the other Defendants contend that the amended complaint does not contain sufficient factual allegations tying each individual Defendant to the alleged fraudulent schemes. Gottlieb further emphasizes that there is not a requirement that a billing processor "verify who performed the services, or what services were performed" rather than simply relying on the records. (Document 109 at 2.)

---

2 Gottlieb briefed a motion to dismiss separate from the remaining Defendants, who jointly briefed their motion. Because the arguments overlap, the Court has addressed the arguments jointly.

The Relator asserts that she has adequately alleged that "CMS routinely revokes providers' enrollment and billing privileges when CMS learns of a provider engaging in the unlicensed practice of medicine, including corporate providers." (Document 113 at 2–3.) She relies on administrative decisions from the DHHS Departmental Appeals Board, finding that licensure violations were inconsistent with compliance with Medicare enrollment requirements and revoking Medicare privileges. She further notes regulations requiring notice of license revocation. She contends that her allegations regarding Dr. Mayer's notice of the license revocation, combined with his roles at BP, BPWV, and EmCare and the corporate relationships between EmCare, Envision, and Holiday, suffice to allege scienter. As to the upcoding violations, the Relator focuses on her allegations of a long-standing policy at BP and BPWV to have physicians sign off on charts for patients who were seen only by mid-level providers. She argues that "[t]his evidence also strongly implies, if not outright demonstrates, that Relator's experience was hardly an isolated incident." (*Id.* at 17.) She contends that her allegations sufficiently allege presentment as to both schemes, arguing that BPWV was the exclusive ER provider, and bills would necessarily have been generated as to each of the 25,000-plus Medicare patients who visited the ER during the period BPWV lacked requisite licensing authority. Although she concedes that she lacks information of specific billing records for other patients, she argues that other patients were "almost certainly in the same position as the Relator" and contends that her Amended Complaint contains sufficient particularity as to the alleged false claims. (Document 112 at 8.)

### A. *License Revocations*

The Court will first address the allegation that BPWV's license revocations, as well as failures to fully comply with the terms of BPWV's contract with CCMC, rendered all claims issued

8

to Medicare during the applicable time period to be fraudulent or false. The Court previously found that the original complaint did not allege facts sufficient to support a finding that revocation of a business license resulting from failure to renew the license was material to payment decisions. The Relator added additional allegations in the amended complaint. However, the Court finds that those allegations, if proven, remain insufficient to establish materiality.

The Supreme Court addressed the application of the FCA to the cases brought under the "false certification theory" in a 2016 case. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995 (2016). The Court found that "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's non-compliance with a statutory, regulatory, or contractual requirement. In these circumstances, liability may attach if the omission renders those representations misleading." *Id*. The Supreme Court held that the misrepresentation must be material to the Government's payment decision to be actionable and described a 'rigorous' materiality standard. *Id*. at 1996. It explained that "the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive" in evaluating materiality. *Id*. at 2003. "[P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." *Id*. at 2003–04. The Supreme Court specifically contemplated that courts would consider materiality at the motion to dismiss or summary judgment stage, noting that "False Claims Act plaintiffs must also plead their claims

with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by…pleading facts to support allegations of materiality." *Id*. at n. 6.

In *Escobar*, a Medicaid beneficiary received counseling services that the provider billed to Medicaid. Several of the practitioners who treated her, as well as other practitioners at the facility, were unqualified, unlicensed, and unsupervised, yet provided counseling and prescriptions in violation of regulations to the contrary. The providers "misrepresented their qualifications and licensing status to the Federal Government to obtain individual National Provider Identification numbers" in order to qualify for reimbursement, and the facility submitted reimbursement claims applicable to services its employees were not qualified to provide. *Id.* at 1997. The Supreme Court approved the theory of liability but remanded for the lower courts to determine in the first instance whether the relator adequately stated a claim, including issues of materiality and scienter. The First Circuit concluded that the alleged misrepresentations in *Escobar* were material, reasoning that regulatory compliance was a condition of payment, that licensing and supervision were central requirements, and that there was no evidence that the government paid claims despite knowing of the violations. *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110 (1st Cir. 2016).

The Fourth Circuit applied *Escobar* in *United States v. Triple Canopy, Inc.*, a case involving false certifications that security guards hired to provide base security in an overseas combat zone met a marksmanship requirement. 857 F.3d 174, 179 (4th Cir.), *cert. dismissed*, 138 S. Ct. 370 (2017). The court concluded that "common sense and Triple Canopy's own actions in covering up the noncompliance" demonstrated that the marksmanship requirement was material. *Id*. In addition, the court noted that "the Government did not renew its contract for base security

with Triple Canopy and immediately intervened in the litigation," further establishing that the "falsehood affected the Government's decision to pay." *Id*.

West Virginia law requires corporate entities like BPWV to file an annual report and pay a fee to maintain business and corporate medical licenses. Maintaining such licenses, in turn, is required to manage a medical facility. Medicare and Medicaid require entities and individuals seeking reimbursement to follow all applicable laws and regulations and to inform CMS of any change in licensure status. BPWV had the required licenses when it entered into its initial contract to manage the CCMC ER, but the licenses were revoked when it failed to file the required paperwork and pay the fee to the state. It continued to manage the ER and submit reimbursement claims without notifying CMS of the license revocations.

Contrary to the facts in *Escobar*, the regulatory violation and licensing issue here was not "central" to the services provided to patients and reimbursed by Medicare. BPWV's failure to maintain its business and medical licenses brought it out of compliance with the regulations, but there are no allegations that BPWV's license status impacted the core medical services provided to patients and reimbursed by Medicare or the qualifications of the medical personnel providing care at CCMC. The United States declined to intervene in this matter. There is no evidence that the Defendants had knowledge of any refusal by CMS to pay claims under similar circumstances.

The Relator relies heavily on administrative decisions, particularly *Acute Care Homenursing Services, Inc.*, DAB No. 2837 (2017) (H.H.S. Dec. 19, 2017).[3] Acute Care

---

3 The Relator cites other administrative decisions involving license revocations that resulted from misconduct, as opposed to paperwork errors or revocations resulting solely from failure to file for renewal or pay standard fees. The Court has focused on *Acute Care Homenursing* both because the Relator's arguments centered on it and because it has sufficient factual similarity to permit useful analysis, while decisions involving revocation of a provider's medical license following criminal charges, for example, provide little insight relevant to this case.

Homenursing was enrolled in Medicare, but its articles of incorporation and authority to do business were revoked for failure to pay corporate franchise taxes under Ohio law in 1999. The president and owner of the company also owned another business, AC Health Care Services, operating as Primary Nursing Care, which shared a practice location with Acute Care Homenursing, but was not enrolled in Medicare. Acute Care Homenursing filed renewal applications with CMS that falsely conflated the two businesses and failed to disclose the revocation of its articles of incorporation. CMS revoked Acute Care Homenursing's Medicare enrollment as a result of its noncompliance with various enrollment requirements related to provision of complete, accurate, and truthful information and its failure to comply with licensing requirements.

The decision makes clear that review "is limited to determining whether CMS's action is legally authorized and does not extend to second-guessing whether CMS properly exercised its discretion in deciding to revoke a particular provider." *Acute Care Homenursing Services, Inc.*, DAB No. 2837 at *8 (2017) (H.H.S. Dec. 19, 2017). The decision is simply a finding that Acute Care Homenursing violated certain regulations and enrollment requirements sufficient to authorize CMS to revoke its enrollment. The DAB specifically distinguishes the standards applicable to the False Claims Act, noting that it contains knowledge requirements not present for revocations, and it rejects arguments that CMS must "consider the nature, importance or potential for program detriment" of any false information prior to revoking Medicare enrollment. *Id.* at *7. The DAB notes that provision of false information about corporate identity "is material, if not central, to any enrollment application" and could result in "confusion and disruption to the billing and claims process." *Id.*

The FCA demands substantially more. CMS is entitled to revoke Medicare enrollment for violation of many regulatory provisions, whether or not they are material to the service and care provided. The Supreme Court specifically explained that the FCA is not designed to "punish[] garden-variety breaches of contract or regulatory violations" and a "misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment" or has the option to decline payment based on the noncompliance. *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2003 (2016). CMS's decision, on a single occasion, to revoke Medicare enrollment status *prospectively* based on the misrepresentation of corporate licensure status, is not sufficient to establish that BPWV's failure to comply with state licensing regulations was material to a payment decision for services already rendered. BPWV's noncompliance cannot fairly be described as more than "minor or insubstantial." *Id.* Thus, the Court finds that the Relator has not adequately alleged facts supporting a finding that the ministerial revocation of BPWV's state licenses were material.

The amended complaint continues to fall short regarding scienter as well. The amendments assert additional facts as to Dr. Mayer's relationships and the relationships between the various Defendants. However, the Relator's theory still requires an inference that the Defendants were aware that the licenses had been revoked, were aware that Medicare would refuse to pay any claims for treatment at the CCMC ER if it knew of those license revocations, and chose to defraud Medicare rather than file the proper paperwork with the State of West Virginia and pay a nominal fee. This is not a case in which a defendant received a significant benefit by failing to comply with the applicable regulation or contract term by relying on unqualified personnel or

failing to perform claimed services altogether. The allegations presented do not plausibly lead to the conclusion that the Defendants *knowingly* chose to submit false claims, rather than spending a few minutes and a few dollars to renew BPWV's business and medical licenses.[4] The reasonable inference arising from the factual allegations contained in the complaint is that BPWV and BP acted negligently in failing to complete required paperwork, much as an individual might negligently fail to renew her car registration after receiving mailed notice. Because the Relator did not state sufficient allegations regarding materiality or scienter, the Court finds that the Defendants' motions to dismiss should be granted as to the implied false certification allegations.

### B. Upcoding Allegations

The Relator next alleges that the Defendants improperly billed services provided solely by a nurse practitioner at a physician rate. The Relator alleges that she discovered that Medicare was billed for her ER visit using a code applicable to care provided by a physician for a problem of high severity. She alleges that she actually saw only a nurse practitioner, who diagnosed her with cellulitis and discharged her with a prescription for antibiotics. She further alleges that Dr. Perni testified during her medical malpractice action that he signed her medical chart as her Attending Physician only for billing purposes but was not responsible for her care.[5] In addition, she alleges that BP and BPWV had a practice of instructing physicians to sign off on medical charts for patients seen by mid-level providers in order to bill at the higher physician rate.

---

4 In other words, this alleged scheme did not involve a substantial benefit to the Defendants or a substantial loss to the United States. The Defendants continued to receive payments after BPWV's licenses were revoked, but returning to compliance would have required minimal effort and money. The United States, in turn, paid claims for medical care provided to patients by qualified personnel.

5 The Relator also alleges that it was improper for Dr. Perni to bill as a *locum tenens* provider because Dr. Boyko was not originally scheduled to work on the date in question. Because the amended complaint does not plead any facts suggesting that the scheduling arrangements of the physicians would be material to payment, the Court will not further address that issue.

It is well-established that upcoding, or billing for a more expensive service than that provided, is a type of fraud that may be remedied by the FCA. *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 779 (7th Cir. 2016) (The "complaint sufficiently alleges that the defendants misused a billing code and falsely represented to the state and federal governments that a certain treatment was given by certain medical staff when in fact it was not."); *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 498, fn. 2 (6th Cir. 2007) (describing upcoding as "a common form of Medicare fraud").

Accepting the Relator's factual allegations as true, the nurse practitioner did not provide treatment incident to the services of a physician when she treated Ms. Taylor. Ms. Taylor was not seen by a physician at all, and Dr. Perni did not consider himself responsible for her care. He signed her medical records after she had been discharged. He admitted that he filled out the medical record in a manner designed to ensure Ms. Taylor's care would be billed at the full physician rate, and that he did so only for billing purposes. There is no reasonable interpretation of the regulations that would permit billing for care provided by a physician under the facts presented. Under these alleged facts, the Court continues to find that the Relator has adequately alleged that Dr. Perni knowingly created a false record material to a false or fraudulent claim made to Medicare.

However, the Relator's allegations still fall short as to the remaining Defendants. Particularly in light of the Rule 9(b) standard, the complaint does not contain factual support for the conclusory allegations that the remaining Defendants knew that the medical records were false. The regulations do permit care provided by mid-level providers to be billed at a physician rate in some circumstances. Therefore, to assert a claim, the Relator must assert facts supporting a

conclusion that each Defendant was aware that Dr. Perni did not actually provide consultation regarding the Relator's care but completed the record inaccurately solely for billing purposes. Although the amended complaint alleges an ongoing upcoding scheme, it does not suggest that any Defendant other than Dr. Perni had knowledge of the disparity between the care provided and the medical record in the Relator's case. Gottlieb received the medical records as generated by Dr. Perni and generated bills as directed by BPWV. There are no factual allegations suggesting that any other Defendant had any involvement in the creation of Ms. Taylor's medical record or the generation and presentation of the claim to Medicare based on those records. Likewise, there are no factual allegations suggesting that any other Defendant had any knowledge of the truth or falsity of the information contained in the medical record and resulting claim. Therefore, the claims related to Ms. Taylor's medical bills must be dismissed as to all Defendants except Dr. Perni.

The Relator asserts that the Defendants engaged in a *practice* of upcoding. Such schemes, including the presentment of false claims, must be alleged with particularity. The Fourth Circuit has held that "an FCA plaintiff must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008). Further, "liability under the Act attaches only to a claim actually presented to the government for payment, not to the underlying fraudulent scheme," and therefore, alleging the contours of a scheme without the specifics of the claims is generally insufficient. *U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 456 (4th Cir. 2013). The court held that "when a defendant's actions, as alleged and as reasonably inferred from the allegations, *could* have

led, but *need not necessarily* have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment." *Id.* at 457 (emphasis in original).

The complaint contains no details as to any false claim other than the bill for Ms. Taylor's care. The regulations regarding the appropriate billing codes are complex and proper billing turns on the facts of each case, including the level of involvement of both a mid-level provider and a physician. There are no factual allegations regarding the time or the contents of any false representations in other medical bills, nor are there specific allegations regarding the identity of the individuals allegedly making such false claims. The heightened pleading standard is designed to eliminate actions in which such facts can be learned only through discovery. The Relator argues that she could not be expected to have access to detailed medical records. The FCA does not open the doors of discovery to every potential relator who uncovers a hint of impropriety. The FCA is available only to those who can begin litigation with relatively detailed information about the alleged false claims. The Court cannot reasonably infer from the allegations in the complaint that additional "specific, identifiable claims" were *necessarily* presented for payment. *Id.* at 458. Because allegations of any false claims based on upcoding for patients other than Ms. Taylor rely on speculation, the Court finds that the motions to dismiss should be granted as to such claims.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendant Martin Gottlieb & Associates, LLC's Motion for Leave to File Response to Plaintiff's Memorandum in Opposition to Defendant, Martin Gottlieb & Associates, LLC's Motion to Dismiss*

*Amended Complaint* (Document 116) be **GRANTED** and that *Defendant Martin Gottlieb & Associates, LLC's Motion to Dismiss Amended Complaint* (Document 108) be **GRANTED**.

The Court further **ORDERS** that *Defendants Michael J. Boyko, M.D., Mark Perni, D.O., BestPractices of West Virginia, Inc., BestPractices, Inc., Holiday Acquisition Company, Inc., EmCare, Inc., and Envision Healthcare Corporation's Motion to Dismiss Amended Complaint* (Document 110) be **DENIED** as to the claims, asserted in Counts One and Two, that Dr. Perni made, or caused to be made, false records and/or a false claim, as to the records and billing associated with the Relator's August 2-3 emergency room visit, and **GRANTED** as to all other claims and all other Defendants.

The Court **DIRECTS** the Clerk to send a certified copy of this Order to counsel of record and to any unrepresented party.

ENTER: January 31, 2020

_____
IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA